BATCH #  :   297001      REF # :  505
ACCT #   :   5491500062900425
TYPE     :   MASTERCARD          10/00
AUTH #   :   926539
                4 *PLSVGRP40725   5411
```

FREE TO PAY ABOVE TOTAL AMOUNT
ACCORDING TO CARD ISSUER AGREEMENT.

DEFENDANT'S
EXHIBIT

Attachment 4 to Order of January 22, 2003

**Keith HARRIS, Petitioner,**

v.

**Christopher ARTUZ, Superintendent
of Green Haven Correctional
Facility, Respondent.**

**No. 97–CV–2135 JBW.
No. 03–MISC–0066(JBW).**

United States District Court,
E.D. New York.

Aug. 26, 2003.

250

Eleanor Jackson Piel, New York, NY, for Petitioner.

Cynthia Kean, Valerie A. DePalma, The Office of the District Attorney, Brooklyn, NY, for Respondent.

MEMORANDUM, JUDGMENT
& ORDER

WEINSTEIN, Senior District Judge.

Petitioner was convicted of murdering a man whom he allegedly attempted to rob of a shearling coat on the streets of Brooklyn. He was also convicted of assault for shooting another man in the hand during the incident. The evidence against him on all counts was primarily the testimony of four eyewitnesses, one of whom was the man who was purportedly shot in the hand. Medical records in possession of the defense indicate that the man who claimed to have been shot in the hand was in fact stabbed and not shot. As discussed below, these records contradict the testimony of all four of the prosecution's eyewitnesses, strongly suggesting the possibility that the witnesses colluded in their testimony in an effort to frame petitioner for a crime that was committed by one of them.

Hearings were held. Petitioner was present by telephone. Petitioner's habeas corpus counsel, appointed by this court, was present in person.

Because petitioner makes a serious allegation that his trial lawyer was ineffective, efforts were made by petitioner's counsel to procure his attendance. *See Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir.1998) (per curiam) ("[A] district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs."). These efforts were unsuccessful.

For the reasons stated orally at the hearing on August 26, 2003, the application for a writ of habeas corpus is granted. This memorandum addresses petitioner's claims. The oral statements and findings at the hearing are deemed part of this memorandum.

I. Facts and Procedural History

Petitioner was put on trial primarily for the shooting of Benjamin Acevedo, allegedly because the victim would not give petitioner the shearling coat that he was wearing. The chief evidence against petitioner was the testimony of four eyewitnesses, all of whom knew the victim and were either related, romantically involved, or friends with each other. None of the witnesses knew petitioner.

The first witness, Gregory Deas, was a convicted felon who had previously (1) pled guilty to robbery with a gun; (2) been convicted in a separate incident of attempted first degree robbery with a knife; and (3) been convicted in yet another incident of illegal possession of a gun. Deas testified at petitioner's trial that a man whom he knew, Brian Coleman, approached him on the street wearing an "8–Ball" jacket. He was accompanied by another man, later identified by Deas as petitioner, whom he did not know. This other man was wearing a green army jacket. Coleman asked Deas for some money but Deas refused. Coleman then told Deas to "give me what you got" or else he would have the man in the green jacket shoot Deas. Trial Tr. at 73. When Deas refused, Coleman told the man in the green jacket to shoot him. According to Deas, the man drew a gun and pointed it at Deas, but Deas charged him as the trigger was pulled, with the result that Deas was shot in the hand. The man in the green jacket fell and dropped the gun.

Deas then ran down the street toward Benjamin Acevedo, telling him that "the dudes are shooting at us." *Id.* at 78. Deas knew Acevedo, who apparently had a relationship with Deas's sister, Kim Kent. According to Deas, the man in the green

jacket came up to Acevedo and said something which Deas could not hear. Acevedo took off the headphones of his Walkman radio and then the man shot him.

The second witness to the shooting, Augustus Cora, testified to much the same story. Cora, though unrelated to Gregory Deas and Kim Kent, stated at trial that he called them "Uncle Greg" and "Aunt Kim," respectively. Cora, who did not know either Coleman or the man in the green jacket, testified that he saw the man in the green jacket pull out a gun and point it at Deas. Deas then "went to smack [the gun] out of his hand" and the man in the green jacket "shot him in his hand." *Id.* at 117–18. Cora then saw the man in the green jacket approach Acevedo and tell him to give him his coat. Acevedo took off his Walkman headphones and said, "What?" The man then shot him. Cora later identified petitioner as the man in the green jacket.

The third witness to the shooting was Susan Mellieon, Cora's ex-girlfriend, who largely testified to the same facts and details as Cora. In particular, she stated that she heard a gunshot and witnessed the man in the army jacket pointing a gun at Deas. *Id.* at 16–37. She also identified petitioner as the man in the green jacket.

The fourth witness to the shooting was Kim Kent, Deas's sister. Kent testified that she had known the victim, Acevedo, for a long time. Just prior to the shooting they were in her apartment and "had a little argument because I came home late." *Id.* at 155. The extent of their relationship was not developed further at trial. Kent testified to the same story as Cora and Mellieon, but added that the shearling coat that Acevedo was wearing and that the man in the green jacket had demanded was in fact hers. She stated that she witnessed the man in the green army jacket "pull out the gun, [and] fire" at Deas.

*Id.* at 160, 161. She also later identified petitioner as the man in the green jacket.

Much of the remaining evidence against petitioner was testimony from police officers. Briefly summarized, an officer testified that after speaking with some "civilians" in the parking lot of their precinct house, he and his partner observed two men, one wearing an "eight-ball" jacket and the other a green army jacket, walking along Ralph Avenue about two to three blocks away. The two men split up. The officers followed, turned down Halsey Street, then received a radio call and turned down Howard Avenue, proceeding toward 106 Howard Avenue. When they arrived they went into the building and up onto the roof of the building, which was three or four stories tall. There they found petitioner, wearing a green army jacket, inside an air shaft.

Another officer testified that he and his partner received a radio call, spoke with two males, and proceeded to 106 Howard Street. They went into the building, up the stairs, and onto the roof after hearing a door slam. The officer also saw petitioner wearing a green army jacket in the air shaft.

No weapon was recovered. No forensic evidence was introduced suggesting that petitioner had fired a gun.

Petitioner testified in his own defense. In summary, he claimed that he was walking home from a night at the movies in Manhattan when he heard two gunshots. He ducked down and saw two people running by, then got up and continued walking toward his home. As he was crossing the street, two men in a car pulled up beside him and said he was a "dead mother fucker." *Id.* at 218. He then ran into an apartment building, up to the roof and into the air shaft, where he was discovered by police.

The jury, which had heard testimony from each of the eyewitnesses that a man in a green army jacket shot Deas in the hand, was never told that medical records showed that Deas was *not* shot, but was instead stabbed in the hand. Counsel did not seek to impeach Deas with the medical records and he at no time referred to the records during the trial. Defense counsel never suggested to the jury that the medical records might indicate that the four witnesses—all close friends who knew the victim well—had colluded to frame petitioner for a homicide that was in fact committed by one of them. Counsel did not suggest, for instance, that Kim Kent's argument with the victim might have supplied some motive for her brother Gregory Deas, a convicted violent felon, to shoot Acevedo. Counsel did not suggest that the four witnesses colluded to tell a consistent story inculpating petitioner in order to deflect suspicion from Deas.

To the contrary, defense counsel began his summation by stating, "There is no dispute that Gregory Deas was shot. There is no dispute that Benjamin Acevedo was murdered. I also suggest to you that there is no doubt that the guy in the green army jacket shot Gregory Deas and murdered Benjamin Acevedo. The question is, who was the man in the green army jacket." *Id.* at 249. Having for some reason conceded "facts" that were inaccurate, counsel adopted the dubious strategy of suggesting that all four eyewitnesses had misidentified petitioner as the shooter—even though he was found by police blocks from the shooting, hiding in an air shaft and wearing a green army jacket. Counsel in fact told the jury, "I'm not suggesting to you, by any stretch of the imagination, that these people want to get [petitioner] Keith Harris per se. There is no reason for that. They never met with Keith Harris prior to the night this happened.... There is no reason for

them to be out to get Keith Harris." *Id.* at 253.

Petitioner was convicted by the jury of second degree murder, first degree attempted robbery, second degree assault, and second degree criminal possession of a weapon. He was sentenced to consecutive terms of 25 years to life in prison for the murder and 5 to 15 years in prison for the attempted robbery. The other sentences were to run concurrent, yielding a total sentence of 30 years to life in prison.

The convictions were affirmed on appeal by the Appellate Division. Leave to appeal was denied by the New York Court of Appeals. Multiple state collateral proceedings yielded no relief.

In the instant application for a writ of habeas corpus, petitioner claims that (1) he was denied the effective assistance of counsel; (2) the prosecutor's failure to disclose serology reports denied petitioner due process of law; and (3) the prosecutor committed misconduct before the grand jury and at trial.

## II. AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural,

resolution of a federal claim." *Sellan v. Kuhlman,* 261 F.3d 303, 313 (2d Cir.2001) (quoting *Aycox v. Lytle,* 196 F.3d 1174, 1178 (10th Cir.1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

"[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton,* 295 F.3d 270, 278 (2d Cir. 2002); *see also Yung v. Walker,* 341 F.3d 104 (2d Cir.2003) (amended opinion) (district court's habeas decision that relied on precedent from the court of appeals is remanded for reconsideration in light of "the more general teachings" of Supreme Court decisions). The Court of Appeals for the Second Circuit has also indicated that habeas relief may be granted if a state court's decision was contrary to or an unreasonable application of "a reasonable extension" of Supreme Court jurisprudence. *Torres v. Berbary,* 340 F.3d 63, 72 (2d Cir.2003). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III. Exhaustion

In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). "This exhaustion requirement is ... grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson,* 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The exhaustion requirement requires the petitioner to have presented to the state court "both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982) (en banc).

■ Pursuant to AEDPA, a district court may now, in its discretion, *deny* on the merits habeas petitions containing unexhausted claims—so-called "mixed petitions." *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding

the failure of the applicant to exhaust the remedies available in the courts of the state."). In addition, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *Id.* § 2254(b)(3); *see also Ramos v. Keane,* No. 98 CIV. 1604, 2000 WL 12142, *4, 2000 U.S. Dist. LEXIS 101, at *10 (S.D.N.Y.2000) (state's failure to raise exhaustion requirement does not waive the issue).

## IV. Procedural Bar

A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546.

█ If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. *See Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

When a state court "says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved." *Glenn v. Bartlett,* 98 F.3d 721, 724–25 (2d Cir.1996). When a state court "uses language such as

'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama v. Comm'r of Corr. Svcs.,* 235 F.3d 804, 810 (2d Cir.2000). Where "a state court's ruling does not make clear whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not given, because we cannot say that the state court's decision was on the merits." *Su v. Filion,* 335 F.3d 119, 126 n. 3 (2d Cir.2003) (citing *Miranda v. Bennett,* 322 F.3d 171, 178 (2d Cir.2003)). This congeries of holdings leaves it an open question whether there are "situations in which, because of uncertainty as to what the state courts have held, no procedural bar exists and yet no AEDPA deference is required." *Id.*

## V. Ineffective Assistance of Counsel

█ The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to counsel is "the right to *effective* assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (emphasis added). The Supreme Court has explained that in giving meaning to this requirement we must be guided by its purpose—"to ensure a fair trial"—and that therefore the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on a Sixth Amendment

claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *id.* at 688, 104 S.Ct. 2052, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052. *See also Wiggins v. Smith,* 539 U.S. ——, 123 S.Ct. 2527, 2542–43, 156 L.Ed.2d 471 (June 26, 2003); *United States v. Eyman,* 313 F.3d 741, 743 (2d Cir.2002). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

■■■■ The performance and prejudice prongs of *Strickland* may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice .... that course should be followed." *Id.* at 697, 104 S.Ct. 2052. In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the "cumulative weight of error" in order to determine whether the prejudice "reache[s] the constitutional threshold." *Lindstadt v. Keane,* 239 F.3d 191, 202 (2d Cir.2001). The court must also keep in mind that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052. "The result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Purdy v. Zeldes,* 337 F.3d 253, 260 (2d Cir.2003) (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). Ineffective assistance may be demonstrated where counsel performs competently in some respects but not in

others. *See Eze v. Senkowski,* 321 F.3d 110, 112 (2d Cir.2003).

■■■■ As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052. Counsel, in other words, "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052. Where counsel fails to make a reasonable investigation that is reasonably necessary to the defense, a court must conclude that the decision not to call an expert cannot have been based on strategic considerations and will thus be subject to review under *Strickland*'s prejudice prong. *See Pavel v. Hollins,* 261 F.3d 210, 223 (2d Cir.2001) (counsel ineffective in a child sexual abuse case where his failure to call a medical expert was based on an insufficient investigation); *Lindstadt,* 239 F.3d at 201 (same). The court of appeals for the Second Circuit has recently gone so far as to imply that all of counsel's significant trial decisions must be justified by a sound strategy—a significant raising of the bar that would appear to require an unrealistic degree of perfection in counsel. *See Eze,* 321 F.3d at 136 (remanding to district court for factual hearing because it was "unable to assess with confidence whether strategic considerations accounted for ... counsel's decisions").

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

Each factual claim made in support of an allegation of ineffective assistance of counsel must be fairly presented to a state court before a federal habeas court may rule upon it. *See Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir.1991) (dismissing petition as unexhausted where petitioner's claim of ineffective assistance of counsel alleged more deficiencies before the habeas court than were presented to the state court, because "[t]he state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole" (quotation omitted)). Where an additional factual claim in support of the ineffective-assistance allegation merely "supplements" the ineffectiveness claim and does not "fundamentally alter" it, dismissal is not required. *Caballero v. Keane*, 42 F.3d 738, 741 (2d Cir.1994).

## VI. Certificate of Appealability

A certificate of appealability may be granted with respect to any one of petitioner's claims only if petitioner can make a substantial showing of the denial of a constitutional right. Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. *See* 28 U.S.C. § 2253; *Miller–El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). The court has taken into account the rule of section 2253(c)(3) of Title 28 of the United States Code that a certificate of appealability "shall indicate which specific issue or issues satisfy the [substantial showing of the denial of a constitutional right] required by paragraph (2)." *See also Shabazz v. Artuz*, 336 F.3d 154, 160 (2d Cir.2003).

This opinion complies with *Miranda v. Bennett*, 322 F.3d 171, 175–77 (2d Cir. 2003), and Rule 52 of the Federal Rules of Civil Procedure. No other issue open to consideration by this court has merit. *See*

*Sumner v. Mata*, 449 U.S. 539, 548, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) ("a court need not elaborate or give reasons for rejecting claims which it regards as frivolous or totally without merit").

## VII. Analysis of Ineffective Assistance of Counsel Claim

Petitioner claims that he was denied the effective assistance of counsel because trial counsel failed to impeach witness Deas with evidence that he was stabbed, not shot, in his hand. This claim was raised on direct appeal and rejected by the Appellate Division on the merits:

> The defendant contends that he was deprived of the effective assistance of counsel because his counsel failed to impeach a witnesses's identification testimony, which was inconsistent and inaccurate. The defendant also finds fault with his counsel's failure to attack the credibility of four eyewitnesses on the ground that they were either friends or relatives of the victims. To prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate that he was deprived of a fair trial because he received less than meaningful representation (*see, People v. Flores*, 84 N.Y.2d 184, 187, 615 N.Y.S.2d 662, 639 N.E.2d 19). The defendant's contentions are unsupported by the record. Indeed, the record shows that the defendant's counsel focused his cross-examination of the People's witnesses and his summation on the identification issue and explored the possibility of collaboration among the witnesses because of their familiarity with each other and with the victims. Accordingly, the defendant received meaningful representation (*see, People v Flores, supra; People v. Badia*, 159 A.D.2d 577, 578, 552 N.Y.S.2d 439).

*People v. Harris*, 211 A.D.2d 685, 622 N.Y.S.2d 61, 61 (App.Div.1995). Leave to

appeal to the New York Court of Appeals on this ground was denied. *People v. Harris*, 85 N.Y.2d 862, 624 N.Y.S.2d 381, 648 N.E.2d 801 (1995).

The Appellate Division, although acknowledging petitioner's claim that counsel was ineffective for failing to impeach Deas, did not in so many words analyze the claim in its decision. Nonetheless, the claim appears to have been reviewed on the merits. Review in the federal court thus proceeds under the deferential standards of AEDPA.

Petitioner must demonstrate that counsel's performance both fell below an objective standard of reasonableness and prejudiced him. The gravamen of the ineffective assistance claim is that if counsel had impeached Deas with the medical reports, not only his testimony but the testimony of all four witnesses concerning the shootings would have been severely undermined.

When this ineffective assistance claim was raised in the state courts, respondent refused to concede that the medical records indicated that Deas had in fact been stabbed rather than shot. That argument appears untenable—or at least a jury could have found it so. The relevant medical records are the following:

- A "Triage Form" for Gregory Deas from Woodhull Medical and Mental Health Center indicating, under "chief complaint," that Deas was "assaulted 30 min ago hand stab wound of right hand." "Laceration" is circled on the form, with the location indicated as "R hand."

- An "Ambulance Call Report" for Gregory Deas in which the "chief complaint" indicates that Deas told personnel, "I was stabbed." The "presumptive diagnosis" is "stab R hand." Under "comments" is the statement that "pt. c/o stab wound to the hand."

- An "Emergency Department Nursing Flow Chart" stating that Gregory Deas was in the hospital "to get hand R stitched." Under "assessment intervention" is written "lac to R hand yesterday," and "2" lac. to "R palm." The chart also indicates that Deas had previously had surgery for a gunshot to the groin area.

- An Emergency Department form indicating as the "chief complaint" a "laceration to right hand." The treating physician's notes of the physical examination indicate "yesterday cut in Rt. Hand." The diagnosis is "Rt hand laceration." There is also a sketch of a hand with an indication of a V shape on the palm, with the two arms of the V labeled "2 cm" and "3 cm."

Mem. of Law in Support of [Habeas Application], Ex. B.

Attached to petitioner's memorandum of law are an affidavit and curriculum vitae from Howard Liang, M.D., an assistant professor of surgery at New York University School of Medicine. Dr. Liang states that after his review of these records,

I find no evidence that the injury on the patient's palm was the result of a gunshot wound. Bullets either leave entrance exit wounds or produce soft furrows in the soft tissue when passing tangentially. It would be nearly impossible to have a bullet make a sharp right angle turn in the palm, as drawn in the sketch. Moreover, there was no uncertainty at all in the diagnosis or in the description of the appearance of the injury by the health care workers involved with this patient's care.... Accordingly, it is my opinion based on my experience and the records I have examined and made with a reasonable degree of medical certainty that the patient treated in this case did not suffer a gunshot wound.

Liang Aff. at 2. Dr. Liang testified to the same effect at an evidentiary hearing before this court.

Dr. Liang's sworn affidavit and testimony are instructive, but his expert opinion is not necessary to resolution of the instant matter. The medical records could have been used to impeach the testimony of the witnesses. As the trial court itself found, "The hospital records are clearly inconsistent with, and would tend to impeach and discredit Mr. Deas' trial testimony." Mar. 24, 1994 Decision [Denying Mot. to Vacate J.] at 6. Respondent does not in this court press its argument that the medical reports are inconclusive on the question of whether Deas suffered a stab wound or a gunshot wound.

■■■■ Instead, respondent urges that defense counsel's failure to impeach Deas with these reports was motivated by trial strategy. Respondent notes, correctly, that defense counsel's defense to the charges was solely based on a theory of misidentification. Even if a trial counsel's strategy is unwise, tactical decisions will not be second-guessed in a habeas proceeding if they were made after research of the facts of a case and the law; strategic decisions will in general not be questioned when based on an informed review of the record and law. Deference is not owed, however, where counsel's tactical decisions were predicated on an incomplete investigation or where counsel's performance evidences unfamiliarity with the record.

■■■ In the instant case, defense counsel's failure to cross examine Deas and the other witnesses concerning the alleged shooting of Deas's hand cannot reasonably be dismissed as strategic. Simply stated, there was no downside to introducing the medical evidence for impeachment purposes. Defense counsel's theory of the case—that petitioner was misidentified by the four witnesses—would have been aided rather than impeded by the introduction of evidence undermining the veracity of the witnesses. At the very least, their observational powers would have been called into serious question. Bringing the medical records to the jury's attention would not introduce any inconsistency into the defense theory of the case, particularly since defense counsel suggested that petitioner was not on the scene at all.

To the contrary, counsel's failure to impeach the witnesses foreclosed a strong line of defense that could have been presented to the jury in tandem with the misidentification theory or, more likely, could have supplanted the weak claim of misidentification altogether. Defense counsel, because he failed to use the medical records available to him, was unable to argue to the jury that Deas or possibly another of the four eyewitnesses was in fact Acevedo's killer. Deas's violent criminal history—his convictions for armed robbery, his weapons violations, his prior gunshot wounds—would have become relevant as more than a mere aspersion on his credibility. The fact that the victim had just been in an argument with Deas's sister would be probative. Disproving that Deas had been shot in the hand would also suggest that the other three eyewitnesses had colluded to protect Deas by pinning the crime on a passerby in a green army jacket.

Instead, by failing to impeach the witnesses counsel was forced to make concessions that were not only counterfactual but also had the effect of making petitioner's conviction almost inevitable. After defense counsel "conceded" that Deas had been shot and that both Deas and Acevedo were shot by a person in a green army jacket, it is difficult to imagine how any reasonable jury could have failed to convict a man who was found cowering in a roof-

top air shaft several blocks from the shooting, wearing a green army jacket, and identified by four eyewitnesses. Defense counsel sealed petitioner's fate by failing to introduce the critical impeachment evidence.

Because no reasonable trial strategy could have been affected adversely by introducing this evidence, it seems exceedingly unlikely that trial counsel was even aware of it. His failure to make use of the medical records is otherwise beyond reasonable explanation. Even if it could be shown that defense counsel was aware of the documents, "the failure to introduce this evidence, without any plausible justification, appears to be a significant dereliction by the defense." *Eze*, 321 F.3d at 126–27.

■ Respondent suggests that defense counsel's failure to impeach Deas with his medical records, even if error, was not prejudicial in light of the "overwhelming" evidence of petitioner's guilt, as established by the testimony of the other three eyewitnesses. That argument is unconvincing. If Deas was not shot, then the testimony of all four witnesses would necessarily have been impeached by the medical documents. The jury would have been forced to ponder how it could be that four witnesses all told police and testified in court that Deas had been shot, when solid medical evidence demonstrated that he had in fact been stabbed. Even without further guidance from skillful defense counsel, any reasonable juror would be forced to consider how four friends managed to testify to the same physically impossible details.

Petitioner was denied the effective assistance of trial counsel. Trial counsel's performance fell below an objective standard of reasonableness and there is a reasonable probability that, but for counsel's unprofessional errors, the result of the pro-

ceeding would have been different. The state courts' resolution of petitioner's ineffective assistance of trial counsel claim was contrary to and an unreasonable application of federal constitutional law set forth by the United States Supreme Court in *Strickland.* Habeas relief on the claim is warranted.

VIII. Analysis of Remaining Claims

The remainder of petitioner's claims are meritless and would not in themselves warrant habeas corpus relief.

■ Petitioner claims that the prosecutor's failure to disclose serology reports denied him due process of law. Spots of blood were found on petitioner's jacket and appear to have been analyzed by a police laboratory. Results seem not to have been turned over to the defense. It may be assumed for purposes of evaluating his petition that an analysis was performed and that serology test results demonstrate that none of the blood was that of Acevedo or Deas. Even so assuming, the claim is without merit.

The prosecution in a criminal matter has a constitutional obligation to disclose exculpatory evidence to the defendant. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). "A finding of materiality of the evidence is required under *Brady.*" *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Exculpatory evidence is considered material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

Nondisclosure merits relief only if the prosecution's failure "'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375).

Even working under the assumption that tests showed the blood not to be that of Acevedo or Deas, the evidence was not exculpatory. No blood evidence was introduced at trial. There is no reasonable probability that petitioner would have been found not guilty by the jury if the serology report had been provided to the defense. Habeas relief on this ground is not warranted.

■■■ Petitioner claims that the trial court lacked jurisdiction over the action because of the improper conduct of the prosecutor before the grand jury. The Fifth Amendment right to a grand jury presentation in felony cases is not applicable to the states. *Alexander v. Louisiana,* 405 U.S. 625, 633, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). "Once a state itself creates such a right, however, due process may prevent it from causing the right to be forfeited in an arbitrary or fundamentally unfair manner." *Michael v. Dalsheim,* No. 90 CV 2959, 1991 WL 99368, *10, 1991 U.S. Dist. LEXIS 7273, at *30 (E.D.N.Y. May 22, 1991). Nonetheless, claims of deficiencies in state grand jury proceedings are generally not cognizable in a habeas corpus proceeding in federal court because any deficiencies have been rendered harmless by conviction at trial by a petit jury assessing petitioner's guilt under a heightened standard of proof. *See Lopez v. Riley,* 865 F.2d 30, 32 (2d Cir. 1989). That is the case in the instant matter. Habeas relief on this claim is not warranted.

■■■ In a memorandum of law in support of the habeas application, petitioner suggests that the prosecutor committed misconduct during the trial by failing to inform the jury that Deas perjured himself by testifying that he had been shot rather than stabbed. A conviction based on perjured testimony is analyzed under the Due Process Clause of the Fourteenth Amendment. *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Under this standard, a conviction must be set aside if "the prosecution knew, or should have known, of the perjury," and "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The Court of Appeals for the Second Circuit has thus far declined to "draw the contours of the phrase 'should have known.'" *Drake v. Portuondo,* 321 F.3d 338, 345 (2d Cir.2003). The federal Court of Appeals has stated that, because the Supreme Court has not clearly established that habeas relief is available in the complete absence of prosecutorial knowledge of perjury, AEDPA prevents granting of the writ on such grounds. *Id.* at 345 n. 2 (after AEDPA, habeas petitioners can no longer rely on *Sanders v. Sullivan,* 863 F.2d 218 (2d Cir.1988), in which habeas relief was granted in the absence of prosecutorial knowledge of perjury).

The prosecutor did not withhold evidence from the defense. There has been no showing of venality. It was not the responsibility of the prosecutor to present the case for petitioner, who was represented by counsel. Habeas relief on this claim is not warranted. *Cf. Thomas v. Kuhlman,* 255 F.Supp.2d 99, 113 (E.D.N.Y.2003) ("Where ... the prosecutor did not knowingly utilize false testimony and did not withhold from the defense the foundational evidence that would demonstrate the falseness of the witness's testimony, the burden lies on defense counsel rather than the prosecutor to call the jury's attention to

the relevant exculpatory evidence. To hold otherwise would be to require the prosecution to take on duties that are properly in the domain of defense counsel.").

IX. Conclusion

The petition for a writ of habeas corpus is granted based on petitioner's claim of ineffective assistance of counsel. The prisoner shall be released unless within sixty days the state commences prosecution or takes other action appropriate in light of this decision. This decision is stayed until all appellate proceedings are completed and a final mandate is received by this court.

No certificate of appealability is granted with respect to petitioner's remaining claims, petitioner having made no substantial showing of the denial of a constitutional right. Petitioner is reminded that he may seek a certificate of appealability on these claims from the Court of Appeals for the Second Circuit.

SO ORDERED.