**Damecha HARRIS, Petitioner,**

v.

**Daniel SENKOWSKI, Superintendent of Clinton Correctional Facility, Respondent.**

**No. 96 CV 2231(FB)(RML).**

United States District Court, E.D. New York.

Jan. 8, 2004.

As Amended Jan. 26, 2004.

Eric Tirschwell, Kramer, Levin, Naftalis & Frankel, LLP, New York City, for Petitioner.

Eliot Spitzer, Attorney General of the State of New York, by Susan Odessky, Assistant Attorney General, New York City, for Respondent.

### MEMORANDUM AND ORDER

BLOCK, District Judge.

The Court grants petitioner Damecha Harris' ("Harris") *habeas corpus* petition challenging, pursuant to 28 U.S.C. § 2254, his state court robbery conviction, for which he is serving a term of fifteen years to life. Two aspects of this case are rather remarkable: one, the abject ineffectiveness of trial counsel for his failure to confront the victim—the sole witness who identified Harris as the perpetrator at his trial—with a totally different description of him given by her to the police within thirty minutes after the robbery; two, that it has taken Harris almost twelve years from the date of his conviction to obtain relief.

## BACKGROUND

### I. State Court Proceedings

The underlying facts leading to Harris' arrest could not be more simple. On February 25, 1991, at approximately 9:20 p.m., Leonida Punu ("Punu") was robbed outside her home in Queens, New York. Punu called the police, who came to her apartment and took her statement. A complaint report prepared by an Officer Clifton, just thirty minutes after the robbery, states that Punu described her assailant as a black man twenty years of age, standing 5' 4" tall and weighing 130 pounds. Punu is described in the complaint report as an Asian female.[1]

The next evening, two police officers drove Punu around her neighborhood in search of her assailant. After 45 minutes, Punu identified Harris as he was walking on a street; he was accosted and arrested. Two reports relating to his arrest—an On Line Booking System Arrest Worksheet and a Stop and Frisk Report—described Harris, albeit black, as 26 years old, 6 feet tall and 220 pounds.[2]

### A. *Wade* Hearing

Prior to trial, a *Wade* hearing was held to determine whether Punu's identification of Harris should be suppressed as unduly suggestive. *See United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Police officer Russo ("Officer Russo" or "Russo") was the only one to testify. On direct examination, Officer Russo recounted that he spoke to Punu on the day after the robbery; "she gave [Russo] a description of a male and she told [him] that she had seen him in the neighborhood before." *Wade* Hearing Transcript at 5.[3] During that conversation, Russo and Punu arranged "to take a ride around the neighborhood" later that evening to search for the perpetrator. *Id.* Russo testified that as he and a fellow officer drove Punu home that night, the following occurred: "[S]he pointed to a male across the street and she said 'that's him over there.' And I said, 'which person?' And she described him and she said, 'the male running toward the subway.'" *Id.* at 6.

Harris' counsel sought to cross-examine Russo about the complaint report:

Q: On February 26th you spoke with Leonida Punn [sic]; is that correct?

A: Yes.

Q: Did she contact you or did you contact her?

A: I contacted her.

Q: By telephone?

A: Yes.

Q: And you contacted her, you indicated, because you were reading a report; is that correct?

---

1. On October 20, 2003, the Court conducted a *habeas* hearing. The complaint report was placed in evidence at the hearing as Ex. A at H0071; the parties agreed that it states that the report was prepared at 2150 hours (9:50 p.m.) and that the robbery occurred at 2120 hours (9:20 p.m.). *See* Hearing Transcript ("Hrg.Tr.") at 17–18. It is not known whether Punu's statement was given simultaneously with the making of the report or at some prior time during the thirty minute interregnum.

2. The On Line Booking System Arrest Worksheet was placed in evidence at the *habeas* hearing as Ex. A at H0070; the Stop and Frisk Report was placed into evidence as Ex. A at H0075. Both the complaint report and the On Line Booking System Arrest Worksheet stated that the assailant had a mustache.

3. The transcript of the *Wade* hearing is attached as Ex. A to respondent's counsel, Susan Odessky's Feb. 19, 2002 Affidavit in Opposition [to Harris' Petition for Writ of *Habeas Corpus* ] ("Odessky Affidavit").

A: Yes.

Q: Did you take the report?

A: I don't understand what you mean.

Q: In other words, were you the person, the officer, who filled out the information in the report?

A: No.

Q: Did you know who did take the report?

* * *

A: Yeah, the name is on the bottom of the 61.[4]

Q: Do you have the 61 with you?

A: Yes, I do.

Q: Would it refresh your memory as to who took the report if you looked at the 61?

A: Yes ...

Q: Have you refreshed your recollection?

A: Yes.

Q: Who was it that took the report?

A: Demayon. (phonetic) ...

Q: When you spoke to ... Leonida Punn [sic] ... did she ever mention the name Dematra [sic] Harris to you?

* * *

A: No.

Q: Did she provide you with a description of the person that robbed her?

A: Yes.

Q: What was that description?

A: I don't recall offhand right now.

Q: Did you write it down as she was taking it—as she was giving it to you?

A: Write it down, no, but I—no, I don't recall.

*Id.* at 10–13.

Harris' counsel did not pursue the matter; he did not attempt to offer the complaint report into evidence, or call Punu or the officer who wrote the report to testify. The focus of his cross-examination was limited to the issue of suggestiveness. In that regard, he questioned Russo about whether he assisted Punu in identifying Harris by calling her attention to Harris as they were driving:

Q: Immediately prior to her identifying that one person, isn't it true that you pointed to that person and said, Miss Punn [sic], is that him or isn't that him or words to that effect?

A: I don't recall saying that.

Q: Do you recall saying something to her?

* * *

A: Like, are you sure it's him.

* * *

Q: Prior to pointing to that person in the street, isn't it true you said something to her?

A: I don't recall saying anything, no.

*Id.* at 14–15.

Because there was no evidence of suggestiveness, and the court never knew of the description of Punu's assailant in the complaint report, the suppression motion was understandably denied.

## B.   The Trial

The entire trial, from opening statements to verdict, took place in one day, January 15, 1992. Just prior to the commencement of the trial, Harris' counsel unsuccessfully moved to reopen the *Wade*

---

**4.**   At the *habeas* hearing, the complaint report was referred to as a "61."   Hrg. Tr. at 14–15.

hearing to require Punu to testify because her Grand Jury testimony, which he had just received, was at variance with Officer Russo's *Wade* testimony; she told the Grand Jury that "Russo asked me, what about that guy on your left hand side." Trial Transcript ("Trial Tr.") at 10 [5] (quoting Grand Jury Transcript ("Grand Jury Tr.") at 5).[6]

Punu and Russo were the only ones who testified at the trial. Their combined testimony covers just thirty-five pages of the trial transcript. *See* Trial Tr. at 29–64. As noted by the judge, the testimony took all of "25 minutes." *Id.* at 73. Punu's direct examination comprises eighteen pages, *see id.* at 29–47; cross-examination is eleven pages. *See id.* at 47–58. Russo's direct examination covers six pages, *see id.* at 59–63; cross-examination consisted of six questions. *See id.* at 63–64.

The following is the totality of Punu's direct testimony describing the robbery:

Q: Now approximately what time did you arrive home that night?

A: It was about approximately 9:20, 9:25.

Q: And when you arrived home, will you please tell the members of the jury what if anything did you do?

A: Okay. I was on my way—I was walking home along Avon Street and then in front of my house it was Monday evening. So they pick up the garbage in the morning, so the empty garbage was in front of my house. So I put it on the side of my house and then after I drop the garbage and I saw this—I saw a man right behind me on my left

side. I turn around and I saw this man and then I say "You again?" And then he said "I have a gun don't scream."

Q: Now, ma'am, when you said you saw him behind you to the left, where you're seated, would you please point exactly where behind you he was?

A: He was—I dropped the garbage on this side. And then I was—I turn around and saw him on my left side. I turn around like this. I dropped this garbage and then I turn around and I saw him. I said, "You again?"

Q: Now where you're seated, how far was he in relationship to where the Judge is seated? Turn around and look at him.

A: About there.

Court: Four to five feet.

Q: You turned and looked at this individual?

A: Yes.

Q: Now when you said "You again," what were you referring to, ma'am? A: Because three weeks ago, the same day, Monday, same guy, I saw the same guy I was walking along Avon Street. And he was walking in the middle of the street. And I was walking on the pavement. And the minute he saw me, he went to me and then I ran in the middle of the street. And then he said. He acted like that. And then the following week I was on vacation, on a Wednesday, between 5:00 and 6:00,

---

5. The transcript of the trial is attached as Ex. B to the Odessky Affidavit.

6. The minutes of the Grand Jury testimony are attached as Ex. B to the Affidavit in Support of Petition for a Writ of Habeas Corpus

of Jennifer Rochon, Esq., dated Oct. 15, 2003 ("Rochon Affidavit"). Ms. Rochon is an associate of Eric Tirschwell, Esq., the Court's assigned counsel.

I was again, I was taking out garbage because I was on vacation. I was taking out garbage. And this guy is coming from Avon Street. And then he went—when I saw him, I remember he was the same guy that was trying to get me on the week before that Monday.

[Harris' Counsel]: Objection to the characterization, your Honor.

Court: The jury will disregard the statement "trying to get me."

Q: That was the same person you had seen before, right?

A: Yes.

Q: So the second time you saw him, describe how did you see him?

A: I saw him, he was getting near me. When I look at him, I got really scared. And I ran upstairs ... I ran upstairs and kept ringing my doorbell and I told my daughter, "Call the police. Call the police." And the guy said "I'm not going to do anything. I'm just asking for an address."

\* \* \*

Q: On the 25th of February, when you saw him again in front of your house, how many times had that been then?

A: That was the third time.

*Id.* at 33–36.

With regard to the events of the next night, when she identified Harris, Punu gave the following testimony on direct examination:

Q: Now as you got into the automobile with the officers, please tell the members of the jury, where did you go at that point?

A: We drove around—started in Hillside, drove around Downing, and then we went round Avon and we kept going around then we went to Midland, went to Wexford. Kept going around four times.

Q: Okay. Now, when you first went on Midland Parkway, where did the officers turn at that point?

\* \* \*

A: The officer went to Wexford Terrace.

Q: Is that a right or a left?

A: Its [sic] on the right side.

Q: And what happened as they did that?

A: And when we—the officer told me that maybe they will not—he's not around. So I will take you home. And they were going to take me home. And then the officer said did you see anything on your left? I said no, because I was on the right hand side of the car and I was thinking that I was—they were going to bring me home. And then he said okay. We'll drive one more time around. And then we drove one more time around and when we got on Midland Parkway, I saw this man walking, on the righthand side of Midland and I said, that's him. That's him.

Q: Now before you said that had the officer said anything to you?

A: No.

Q: Now after you said that's him, that's him. What happened next?

A: And then—are you sure? Are you sure? The officer said, I'm sure, I'm sure, that's him. That's him. And we made a U-turn. He made a U-turn on Midland Parkway. And then parked the car on Hillside Avenue and Midland Parkway. And then they said "Stay here." And then I stayed there ...

* * *

Q: Tell us what happened.

A: And after that they told me to—they brought the guy and then he said we want you to relax and we want you to be calm and we want you to identify one more time. And when I look at the guy I said "That's him. That's him."

Q: Now, Miss Punu I'm going to ask you to look around this courtroom and tell the members of the jury, if you see the person in this courtroom, that you observed that night?

* * *

A: That's him, the guy.

* * *

Court: Indicating the defendant.

Q: Now is that the person you saw, ma'am, on February 25, 1991?

[Harris' Counsel]: Objection.

A: Yes. That's him.

Court: Overruled.

Q: Is that the person you had seen that previous Wednesday?

[Harris' Counsel]: Objection.

Court: Overruled.

A: That's him.

Q: Is that the person you had seen that previous Monday two weeks before?
A: That's him.

*Id.* at 44–47.

On cross-examination, Punu testified that Hillside Avenue was a "commercial area," *id.* at 52, but Avon was not; further, when asked whether "on February 25, 1991, there wasn't a single male black on Hillside Avenue anywhere in that area," she answered in the affirmative. *Id.* Harris' counsel elicited that there were only two streetlights in the area. *See id.* at 53.

Harris' counsel sought to ascertain whether the officers might have pointed Harris out to her before Punu identified him. He asked her whether "at some point the officer asked you to look to the left, is that correct?" *Id.* at 56. Punu responded in the negative because, as she explained, she was "on the right side and ... was thinking of getting home." *Id.* Harris' counsel did not confront her with the contrary testimony she gave to the Grand Jury, that Russo asked her "what about the guy on your left-hand side." Grand Jury Tr. at 5.

Harris' attorney also asked Punu whether the police "wrote down what [Punu] said" after she identified Harris. *Id.* at 55. She responded that she did not recall; nor did she recall whether she saw "a note pad in their hands." *Id.* Harris' attorney never questioned Punu about the description she gave the police the night of the robbery that was contained in the complaint report; nor did he question her about a statement in the complaint report that "[p]erp. did not display a gun." Complaint Report, Hrg. Ex. A at H0071.

Officer Russo testified about Punu's identification of Harris on the day after the robbery; it tracked his testimony at the *Wade* hearing. *See* Trial Tr. at 62. During the course of his testimony, Russo made an in-court identification of Harris as the person arrested that evening. *See id.* Harris' counsel's six questions on cross-examination merely elicited that Russo was not an eyewitness to the crime and that Harris lived in Brooklyn.

The prosecution offered no other evidence. Harris' attorney did not put in a case; thus, he did not introduce the complaint report into evidence or call Officer Clifton to testify.

In his summation, Harris' attorney's sole theory of defense was mistaken identifica-

tion. He argued that there were many other black males in the area, *see id.* at 80; that Punu was likely "tired, inattentive," *id.* at 84, and that it was "dark." *Id.* He stated: "Someone is behind you and you'd be very scared. You wouldn't be able to point to a lot of detail." *Id.* He also argued that Punu was "inattentive" when she identified Harris the next day. *Id.* at 85.

After deliberating for a little more than three hours, the jury convicted Harris of Second Degree and Third Degree Robbery. *See id.* at 124, 129–30.

### C. Subsequent Proceedings

#### 1. Direct Appeal

Represented by newly-assigned counsel, Harris appealed. Two briefs were submitted by counsel. The first raised three issues: (1) refusal of the trial judge to reopen the *Wade* hearing in light of Punu's Grand Jury testimony; (2) insufficient evidence of physical injury for a second degree robbery conviction, and (3) excessiveness of the sentence. *See* Brief for Defendant–Appellant, dated December 1992, attached to Odessky Affidavit, Ex. D. A supplemental brief asked for dismissal of the third degree robbery conviction on the ground that it was a lesser-included offense. *See* Supplemental Brief for Defendant–Appellant, dated July 1994, attached to Odessky Affidavit, Ex. D. Appellate counsel did not raise ineffectiveness of trial counsel.

In a rambling, disjointed, handwritten supplemental *pro se* brief, Harris specifically referred to the complaint report as further support for reopening the *Wade* hearing, and was critical of Officer Russo's failure at the hearing to acknowledge the

5′ 4″, 130 pound description in the report. *See pro se* Supplemental Brief ("Supp. Br."), dated May 26, 1994, attached to Odessky Affidavit, Ex. F at 8, 14.[7] However, there was no focused criticism of his counsel's failure to elicit the contents of the report at the *Wade* hearing or during the trial. In response, the government sought to capitalize on trial counsel's failure to use the complaint report, thereby injecting the issue of counsel's effectiveness:

> Defendant also raises a number of new issues in his *pro se* brief. For example, defendant challenges for the first time a discrepancy between the victim's description to the police on the night of the robbery and defendant's own physical attributes. Needless to say, Ms. Punu identified defendant on the street (leading to his arrest), identified him after his arrest, and identified him once more at trial. The arresting officer testified that he arrested the defendant—the person identified by the victim—and, like Ms. Punu, also identified the defendant at trial. *Defendant had the opportunity, but failed to use it, to cross-examine both the victim and the police officer before the jury about any such discrepancy with the police description.*

Supp. Br. at 4 (emphasis added).

On February 6, 1995, the Second Department affirmed the conviction for second degree robbery, but reversed the third degree conviction because it was subsumed in the second degree conviction as a lesser-included offense. In respect to the *Wade* hearing, the court concluded that the trial court "acted within its discretion in denying the defendant's application to reopen [the hearing] and to compel production of the complainant, as no substantial issues

---

7. In the body of his Supplemental Brief, Harris referred to the complaint report as an attached exhibit, *see* Supp. Br. at 8; however, a copy of the Supplemental Brief containing the exhibits cannot be located.

regarding the constitutionality of the showup identification were raised." *People v. Harris*, 212 A.D.2d 545, 623 N.Y.S.2d 128 (2d Dep't 1995). It buttressed its holding by commenting that "the defendant made no attempt to impeach the complainant's testimony with her allegedly inconsistent Grand Jury testimony nor did he argue during summation that the pretrial identification procedure was unduly suggestive." *Id.*

Addressing Harris' *pro se* submission, the appellate court summarily concluded that the contentions raised therein were "without merit." *Id.* The Court of Appeals thereafter denied leave to appeal on April 19, 1995. *People v. Harris*, 85 N.Y.2d 939, 627 N.Y.S.2d 1001, 651 N.E.2d 926 (1995).

### 2. Collateral Attacks

While his direct appeal was *sub judice*, Harris filed a number of unsuccessful *pro se* motions pursuant to N.Y.Crim. Proc. L. §§ 440.10 and 440.20 to vacate the judgment of conviction. Only in one did he seem to take issue with his trial counsel's performance, making a number of garbled, fairly unintelligible comments,[8] which elicited a response from the respondent that Harris' motion papers "fail[ed] to state the precise grounds, facts, or law upon which he bases his ineffective assistance of counsel claims." Affirmation in Opposition to Defendant's Motion to Vacate Judgment, dated Jan. 24, 1994, attached to Odessky

Affidavit, Ex. I at 2. The motion was summarily denied, *see People v. Harris*, No. 1371–91, Order dated Feb. 8, 1994, and leave to appeal was denied. *See* Appellate Division Order, dated Dec. 16, 1994.[9]

On August 9, 1997, after his direct appeal was rejected, and after he had initiated, *pro se*, his *habeas* proceeding, Harris filed another *pro se* collateral motion in state court. Although he attached a copy of the complaint report as an exhibit, and challenged his trial attorney's failure to utilize the report,[10] the thrust of his rambling comments seemed to focus, once again, on the *Wade* hearing, leading the court to construe this motion as raising "issues regarding the conduct of the Grand Jury and issues involving identification and the *Wade* hearing." *People v. Harris*, No. 1371–91, Order and Memorandum, dated Oct. 14, 1997, attached to Rochon Affidavit, Ex. F. The court denied the motion, summarily ruling that Harris' claims were procedurally barred and "unsupported by sworn allegations of fact." *Id.* Thus, the court did not pass upon the effectiveness of trial counsel's conduct. The Appellate Division denied leave to appeal. *See People v. Harris*, No. 1371–91, Decision and Order, dated Feb. 18, 1998, attached to Rochon Affidavit, Ex. G.

### II. Federal Proceedings

Harris' *habeas* petition, dated and notarized April 9, 1996, was received by the Court on May 2, 1996. Respondent filed a

---

8. For example, he claimed his counsel had a "conflict of interest" because of his "acquiescence ... refusing to take a guilty plea," and because "at the end of a trial maintained to point out that defendant had committed an [a]trocious crime, and had tried to subvert the ends of justice." Odessky Affidavit, Ex. I at 1.

9. Both orders are attached to the Odessky Affidavit as Ex. L.

10. Harris stated, *inter alia*, that his trial counsel "withheld" the complaint report, as well

as other police reports, which would have established "that the defendant was not the same perpetrator who robbed Miss Leondia Punu on Feb[.] 25, 1991 because the description does not fit the defendant." Petitioner's Affidavit in Support [of 1997 Motion] at 4. Furthermore, Harris argued that his "trial attorney was also aware[,] as well as in possession[,] of these same documents at the same time he question[ed] Officer Russo about the identification[,] denying his own client a fair trial." *Id.* at 14.

motion for a more definite statement on January 29, 1997, which the Court summarily denied on May 19, 1998. Respondent thereafter submitted papers in opposition to the petition on June 18, 1998. On September 14, 1998, the Court referred the matter to a magistrate judge for a Report and Recommendation ("R & R").

## A. The Magistrate Judge's R & R

In his R & R, dated May 10, 2000, the magistrate judge construed Harris' petition as raising the following claims: "(1) improprieties in the Grand Jury proceedings ...; (2) the court's refusal to reopen the *Wade* hearing based on Punu's Grand Jury testimony, which allegedly raised the possibility that Officer Russo prompted the complainant to identify Harris, and (3) the court's imposition of an allegedly excessive sentence." R & R at 5–6. The R & R thoroughly and comprehensively addressed and rejected each of these claims; accordingly, the magistrate judge recommended that the petition be denied.

In discussing Harris' claims relating to the *Wade* hearing, the magistrate judge noted:

> Harris was described in the initial police complaint report as measuring five feet four inches in height and weighing 130 pounds. In the arrest report filed by Officer Russo, Harris is described as measuring six feet in height and weighing 220 pounds. *However, this discrepancy was not raised by defense counsel at trial or on appeal.*

R & R at 14 (emphasis added).

Because the magistrate judge did not construe Harris' *habeas* petition as raising an ineffectiveness claim, the R & R did not address the issue.

## B. Adoption of the R & R

In a Memorandum and Order ("M & O"), dated September 19, 2000, the Court adopted the R & R, after conducting a *de novo* review. As noted in the Court's decision, Harris submitted "thirty-two prolix and muddled pages" of objections to the R & R, and claimed, *inter alia,* that he "was denied effective assistance of counsel," M & O at 2. Nonetheless, the Court viewed the objections as mirroring "in essence" the claims "addressed and examined fully by [the magistrate judge] in the R & R." M & O at 2. In regard to the ineffectiveness claim, the Court acknowledged in a footnote that the magistrate judge did not "address the allegation of ineffective assistance of counsel specifically under that label," *id.* at 2 n. 1; nonetheless, the magistrate judge had "examined the substance of th[e] claim ... and properly found the contentions to be meritless" because "defense counsel [had] cross-examined [Punu] about the show-up identification and had a full and fair opportunity to make arguments concerning the identification on summation." *Id.* (internal quotations omitted).[11]

## C. Circuit Court Remand and the Amended Petition

On May 14, 2001, the Second Circuit granted Harris' request for a certificate of appealability "for the limited purpose of remanding to the district court to permit Harris to amend his *habeas* petition to add

---

11. The Court cannot locate petitioner's Objections to the R & R; the file is somewhat in disarray and has not been easy to work with. There is an unidentified, undated, unnumbered sixteen page document titled "Identification," stating on the first page that "now I feel that my trial lawyer could of [sic] done a better job by rais[ing] the identification." The Court believes this to be part of the missing Objections to the R & R, and the reason why the Court drew the conclusion—not expressly drawn by the magistrate judge—that Harris was claiming that he was denied effective assistance of counsel.

his ineffective assistance of trial and appellate counsel claims." *Harris v. Senkowski*, No. 01–2024, Order dated May 24, 2001. Harris availed himself of this opportunity and filed an amended petition on September 6, 2001.[12]

In his amended petition, Harris squarely claimed that trial counsel was ineffective because he: (1) failed to cross-examine Punu at trial regarding the inconsistency between her initial description of her assailant, contained in the complaint report, and her later identification of Harris; (2) failed to raise the description given in the complaint report during the *Wade* hearing, and (3) failed to impeach Punu with inconsistent Grand Jury testimony. Harris also claimed ineffective assistance of appellate counsel for failure to address these claims on his direct appeal. The Court appointed counsel and ordered a hearing.

## D. The *Habeas* Hearing

The hearing was held on October 20, 2003. The sole witness was Harris' trial counsel. He conceded that his entire theory of defense was "to show that Ms. Punu was mistaken when she identified Mr. Harris as her assailant," Hrg. Tr. at 12, and that "Mr. Harris' conviction rose or fell based upon the identification of this one eyewitness." *Id.* at 11. He confirmed that Harris was indeed six feet tall and 220 pounds. *See id.* at 29–30.

In respect to the *Wade* hearing, he explained that he did not press Officer Russo about the contents of the complaint report because Russo "wasn't the one who took the original report." *Id.* at 27. In respect to the trial, Harris' counsel had no particular reason for not questioning Russo about the report other than a generalized concern about being "very careful[ ] not to open the door, so to speak, regarding anything that might have happened during the arrest." *Id.* at 42. As he explained in that regard:

> I did not want to give the prosecutor any opportunity to elicit testimony from Officer Russo regarding any struggle during the arrest. The fact that there were stolen credit cards. Anything that might be construed as flight, consciousness of guilt, or pounding the cell door at the time of arrest. In so far as knowing that there were these other things, I was very careful what I asked Officer Russo.

*Id.*

In respect to Punu, Harris' counsel made "a conscious decision not to pursue a

---

12. The Circuit Court was, presumably, also somewhat uncertain as to whether Harris' petition squarely raised his ineffective assistance claims, but decided to allow him to amend rather than authorize a successive petition. The uncertain nature of Harris' ineffectiveness claims has permeated his proceedings throughout both the state and federal levels and has undoubtedly contributed to the extensive passage of time before the issues were unraveled and clearly presented to and addressed by this Court. The severe backlog of *habeas* petitions in the Eastern District of New York ("EDNY") also contributed to the delay. Judge Weinstein, aided by his able Special Master, Marc Falkoff, Esq. has recently rendered invaluable service by disposing of 500 of these backlogged cases, a number of which "had been languishing for years—some since 1996." NEW YORK LAW JOURNAL, Vol. 230, No. 14 at 1 (Dec. 11, 2003). As Judge Weinstein has noted, "[o]urs is a heavily overloaded court with extremely hard-working judges, magistrate[ ] judges and staff. Constantly expanding bases of federal jurisdiction and sharply reduced budgets have compounded our difficulty in promptly disposing of these habeas cases despite the need for swift disposition." Jack B. Weinstein, Report on 500 Habeas Corpus Cases at 1, dated Dec. 11, 2003. Regardless of the difficulty that Harris has had in clearly identifying the precise nature of his ineffectiveness claims, and the enormous backlog of *habeas* cases in the EDNY, the Court takes ultimate responsibility for not seeing to it that Harris was not sooner granted the relief to which he is clearly entitled.

line of cross[-]examination regarding the complaint report." *Id.* at 43. As best as can be culled from his testimony, he reasoned that she was "a very strong witness," *id.* at 28, as manifested by "her facial expressions" while testifying, *id.* at 29; she "had recognized [Harris]" from two prior occasions, *id.* at 28; "she never locked herself into the [complaint] report," *id,* and he "didn't want to appear to be pushing her or badgering her in front of the jury." *Id.* at 43.

The following colloquy transpired when the Court questioned Harris' counsel:

Court: It seems to me that we are talking about the fact that Officer Clifton had a conversation with the complaining witness where she described the defendant as five feet four and 130 pounds. That happened a half hour after the incident. Did you speak to Officer Clifton?

Witness: No, I did not.

Court: Did you think of calling him as a witness?

Witness: No, I did not.

Court: Tell me why not . . .

Witness: First, I wouldn't have had the report up until the *Wade.* But, again, unless I can get the witness to say or either deny that she ever gave a different description, I can't impeach her.

Court: Did you ever show her this report that purports to be the description that she gave to Officer Clifton 30 minutes after the incident?

Witness: I don't believe that I did. No.

Court: Is there any reason why you didn't show it to her and confront her with the report? . . . This is the first contact that she had with the authorities about it, is that right? Wouldn't you think that is very significant?

Witness: If I could get her to commit to the report. Again, her signature does not appear on that.

Court: Would you not possibly have shown her this document to see whether or not it refreshes her recollection or whether or not she can acknowledge that she made this statement to the police officer?

\* \* \*

Court: Did you ever ask her whether she told any of the police officers that the defendant was five feet four weighed 130 pounds?

Witness: No, I didn't.

Court: I guess that is really what sort of puzzles me a little bit. You would think having the report in front of you that would be the most simple logical question to ask her. That is not going to open the door to any possible damaging testimony. . . . If she said she doesn't remember then, possibly, you can then show her the report which is used to refresh her recollection. Or if she denies it, you can just call Officer Clifton to testify to the admissions that she made before him. It just seems to me logically that would be the common sense type of cross examination. The way to handle this significant variance to the identification of the perpetrator.

*Id.* at 31–36.

The Court elicited the following testimony from Harris' counsel in respect to his concern about "badgering" Punu:

Court: Why would you be badgering her if you asked her whether she ever told the police a half hour later that this person was five foot four inches tall and 130 pounds? I don't understand why that would be badgering.

Witness: Again, I was trying to get her to testify that she gave the information to the police. She was being some more resistant. She was a strong witness. I didn't believe—

Court: Wouldn't that really go to the heart of destroying her credibility if she weren't to have acknowledged when confronted with this report, that indeed she did say that to the police. Even if she were to walk away from that if you called Officer Clifton, it would place her credibility in serious doubt if he were to testify this is what she actually told me....You have nothing to respond to with respect to that?

Witness: No.

*Id.* at 43–44.

Under questioning by the respondent's attorney, Harris' counsel described his defense strategy as follows:

Q. What was your strategy?

A. Again, I was trying to show that Ms. Punu was coming home from [Midland Park]way. She was distracted. That the incident happened quickly. That she really, again, it is an identification case.

Court: It was dark out, so you really told the jury that Ms. Punu did not have ample opportunity to identify the defendant. That it was dark. This happened very quickly. That he came from behind and etcetera, etcetera [sic], is that right?

Witness: Yes, sir.

Court: You flat out told the jury that your whole case rises or falls on mistaken identification. Yet you didn't bring out the one piece of documentary evidence that you had, because it was dark and because this happened very quickly she got it wrong.

Witness: Yes, sir.

*Id.* at 50–51.

Respondent's counsel sought to establish that, putting the issue of the complaint report aside, Harris' counsel had provided effective representation: He was successful in a motion "to suppress the evidence of other people's credit cards that Mr. Harris had on his person," *id.* at 41; he moved to reopen the *Wade* hearing "[i]n order to properly preserve [the] issue for appeal," *id.* at 49; he "sent an investigator out to try to talk with the complainant," *id.* at 39; he "went to the place where Mr. Harris was arrested," and he explored the prospects of an alibi defense. *Id.* at 40.

In a post-hearing submission, respondent argues that Harris received effective representation because Harris' trial counsel "made a conscious choice not to cross-examine Ms. Punu" regarding her prior description of the attacker, which respondent contends was a "reasoned," "strategic decision" entitled to deference, Letter of Susan Odessky, dated November 21, 2003 ("Odessky Letter") at 6; thus, Harris' counsel's failure to cross-examine Punu with regard to the complaint report did not fall below "an objective standard of reasonableness [under] prevailing professional norms." *Id.* Respondent further contends that counsel's performance should be evaluated from an overall perspective. In that regard, respondent points out that Harris' counsel:

[P]ersonally went to the scene of the alleged robbery, checked out the possible alibi which petitioner had provided him with, and had an investigator attempt to speak with the complainant[ ].... [M]ade a number of [pre-trial] motions[,] ... was successful in convincing the hearing judge to suppress the evidence of the additional stolen credit cards[,] ... made a motion to reopen the *Wade* hearing[,] ... [and] ma[de] a mo-

tion at the close of trial to dismiss the entire indictment.

*Id.* at 4–5. Respondent concludes, therefore, that notwithstanding Harris' counsel's failure to confront Punu with the complaint report, Harris "cannot overcome the strong presumption that counsel's conduct was reasonable" when viewed in light of counsel's overall performance. *Id.* at 6.

Furthermore, respondent contends that Harris cannot demonstrate prejudice because the jury had "proof of petitioner's identity beyond a reasonable doubt in the face of Ms. Punu's strong testimony regarding the fact that prior to the robbery, she had seen him on two previous occasions." *Id.*

## DISCUSSION

### I. Standard of Review

#### A. The *Strickland* Standard

It is settled law that ineffective assistance of counsel claims are evaluated under the two prong standard promulgated by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): A defendant must show that counsel's representation "fell below an objective standard of reasonableness" based on "prevailing professional norms," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. *Strickland* defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

In gauging counsel's performance, *Strickland* instructs that "the court must be 'highly deferential,' must 'consider[ ] all the circumstances,' must make 'every effort ... to eliminate the distorting effects of hindsight,' and must operate with a 'strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance.'" *Lindstadt v. Keane,* 239 F.3d 191, 199 (2d Cir.2001) (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052). Since *Strickland* calls for the examination of the totality of the evidence, no one error need be determinative; rather, multiple errors should be considered "in the aggregate." *Id.* A court may, however, find the right to effective assistance of counsel violated "by even an isolated error of counsel if that error is sufficiently egregious and prejudicial." *Murray v. Carrier,* 477 U.S. 478, 486, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). *See also Lindstadt,* 239 F.3d at 199 ("*Strickland* directs us to look at the totality of the evidence before the judge or jury, keeping in mind that some errors have ... a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture.") (internal quotations and citations omitted). In the *habeas* context, where omissions by counsel "cannot be explained convincingly as resulting from a sound trial strategy, but instead ar[ise] from oversight, carelessness, ineptitude or laziness," courts may find "the quality of representation sufficiently deficient to grant the writ." *Eze v. Senkowski,* 321 F.3d 110, 113 (2d Cir.2003). As aptly noted by the Second Circuit in *Eze,* "[n]otwithstanding the rigors of the *Strickland* standard, counsel's inability to justify her actions by some *plausible* trial strategy could very well lead to the conclusion that her performance was constitutionally deficient." *Id.* at 137 (emphasis added). For example, "an attorney's failure to present available exculpatory evidence is ordinarily deficient, unless some cogent tactical or other consideration justified it." *Pavel v. Hollins,* 261 F.3d 210, 220 (2d Cir.2001) (internal citation omitted).

#### B. Pre–AEDPA Review

Prior to the enactment in 1996 of the Anti–Terrorism and Effective Death Pen-

alty Act ("AEDPA"), Pub.L. No. 104–132, codified in relevant part at 28 U.S.C. § 2254, state court adjudications of pure questions of law, as well as mixed questions of law and fact, were reviewed by federal *habeas* courts *de novo*. *See Pavel*, 261 F.3d at 215. Findings of fact were presumed correct if they were "evidenced by a written finding, opinion or other reliable and adequate written indicia," and were "fairly supported by the record." *Berryman v. Morton*, 100 F.3d 1089, 1094 (3d Cir.1996) (referencing pre-AEDPA § 2254(d)). *See also Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir.2001) (same).

In the context of *Strickland:*

[A] state court's finding that counsel had a trial strategy is a finding of fact to which the *habeas* court must afford the presumption of correctness if that factual finding is supported by the record. However, the question of whether counsel's strategy was reasonable goes directly to the performance prong of the *Strickland* test, thus requiring the application of legal principles, and *de novo* review.

*Berryman*, 100 F.3d at 1095. In the absence of factual findings, *habeas* review would, of course, be fully *de novo*. *See, e.g., Townsend v. Sain*, 372 U.S. 293, 314, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), overruled on other grounds by *Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992) ("If the state court has decided the merits of the claim but has made no express findings, it may still be possible for the District Court to reconstruct the findings of the state trier of fact, either because his view of the facts is plain from his opinion or because of other indicia. In some cases this will be impossible, and the Federal District Court will be compelled to hold a hearing."); 39A C.J.S. Habeas Corpus § 365 ("A plenary hearing in the federal court may be required where

necessary findings of fact were not made in the state court proceedings").

**C. Post–AEDPA Review**

Under AEDPA:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that has been adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

■ In *Eze*, the Second Circuit recently explained the contours and application of AEDPA in the context of a *Strickland* challenge. As the court first noted, AEDPA's deferential standard does not apply unless the federal claims were adjudicated on the merits; otherwise, the pre-AEDPA standard of *de novo* review applies. *See Eze*, 321 F.3d at 121. In order to adjudicate a federal claim on the merits, the state court need only dispose of it "on substantive grounds and reduce that disposition to judgment;" hence, "[no] further articulation of its rationale or elucidation of its reasoning process is required." *Id.* (internal citation omitted). Therefore, "an issue may be considered to be adjudicated on its merits even when the state court does not specifically mention the claim but uses general language referable to the merits." *Id.* (internal quotation omitted). In such cases, the federal court will simply "focus its review on whether the state court's ultimate decision was an unreason-

able application of clearly established Supreme Court precedent." *Id.* at 125 (internal quotation omitted).

As further explained in *Eze*, an unreasonable application of Supreme Court precedent means more than that the state court *incorrectly* applied the precedent; it had to apply the facts in an "objectively unreasonable manner." *Id.* This means that "some increment beyond error is required," but it "need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (internal citations omitted).

■ Although factual determinations by the state court are still presumed correct if fairly supported by the record, *see* 28 U.S.C. § 2254(e)(1) (presumption of correctness), "a state court determination of a factual issue which was not fairly supported by the record can hardly be said to be a reasonable determination." *Berryman*, 100 F.3d at 1104–05. As in pre-AEDPA review, if there are no state court factual findings, *de novo* review is still appropriate. *See, e.g.*, 39A C.J.S. Habeas Corpus § 365 (explaining the nature of federal *habeas* hearings, both pre- and post-AEDPA); *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir.1997) ("If the material facts were not adequately developed at the State court hearing or the District Court finds that the factual determination is not fairly supported by the record, the presumption of correctness [articulated in 2254(e)] is set aside.") (internal citations and quotations omitted); *Spencer v. Donnelly*, 193 F.Supp.2d 718, 731 (W.D.N.Y. 2002) (where state court decision "fails to set forth factual findings on the issue of effective assistance of counsel ... [the] presumption of correctness is inapplicable.... As a result, the Court is at liberty to make its own findings of facts").

### D. Harris' Petitions

■ AEDPA applies to non-capital petitions filed after April 24, 1996, the date the Act became effective. *See Lindh v. Murphy*, 521 U.S. 320, 322, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Pursuant to the "prison mailbox rule," a *pro se habeas* petition is properly considered filed "as of the date it was given to prison officials for forwarding to the court clerk." *Noble v. Kelly*, 246 F.3d 93, 97–98 (2d Cir.2001) (quoting *Adeline v. Stinson*, 206 F.3d 249, 251 n. 1 (2d Cir.2000) (per curiam)). Consequently, district courts in this circuit have engaged in a presumption that "the petition is deemed filed as of the date it was notarized and presumably handed to correctional officials for mailing." *Owens v. Commissioner of Corrections*, 2003 WL 22208496, *2 n. 2 (D.Conn. Sept.4, 2003); *see also DeVino v. Duncan*, 215 F.Supp.2d 414 n. 1 (S.D.N.Y.2002) (date petition notarized was the appropriate filing date because "it is likely that [petitioner] handed the petition over to prison authorities to be mailed on or about that date"). Respondent has not made any effort to rebut the presumption that Harris' *habeas* petition, dated and notarized April 9, 1996, should be deemed filed on that date, even though received by the Court on May 2, 1996; hence, the pre-AEDPA standard for review should apply.[13]

---

**13.** Since the Circuit Court has permitted Harris to amend his *habeas* petition, the amendment should be treated as filed on the date of the original petition because it relates back to that date. *See Littlejohn v. Artuz*, 271 F.3d 360, 363 (2d Cir.2001) (*habeas* petitions "may be amended or supplemented as provided in the rules of procedure applicable to civil actions"); *see also* Fed. R. Civ. Proc. 15 (provisions regarding amending and supplementing pleadings). The result would be otherwise if the Circuit Court had considered the matter to be a successive petition. *See Ching v. United States*, 298 F.3d 174, 181 (2d Cir.2002).

Realistically, it makes no practical difference in this case whether pre- or post-AEDPA standards are applied. First, there are no factual findings by the state courts on any aspect of Harris' trial counsel's effectiveness; therefore, there is no occasion to apply any factual presumption of correctness and no basis for the Court to determine under post–AEDPA review if the state courts' decisions were "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). Second, since *Strickland* is clearly established Supreme Court precedent, it drives the analysis under both standards, and it is difficult, pragmatically, to imagine how the results would be different under *de novo* pre-AEDPA review and the post-AEDPA "unreasonable application" prong of § 2254(d)(1), assuming that the claim was even adjudicated on the merits. *See Cotto v. Herbert*, 331 F.3d 217, 252 (2d Cir.2003) ("[w]e need not and do not resolve today the question of whether § 2254(d)'s standard of review applies because nothing turns on it here") (internal quotation and citation omitted).

■ In this latter regard, it is not at all clear that the precise issue now before the Court was ever adjudicated on the merits in any state proceeding because it was, at best, obliquely presented. A careful review of the rather convoluted record sug-gests that Harris never squarely raised the question of his counsel's failure to utilize the complaint report at trial; rather, his focus was always on seeking to reopen the *Wade* hearing so that Officer Russo could explain the discrepancy in the complaint report and Punu could be called to testify about her inconsistent Grand Jury testimony. Nevertheless, apparently satisfied that Harris' *pro se* submissions to the state courts were intended to question the effectiveness of his counsel at the *Wade* hearing and the trial, respondent has chosen not to claim that the ineffective assistance of trial counsel issue is unexhausted or procedurally barred. *See* Rochon Affidavit, Ex. M ("respondent withdraws and waives any argument that petitioner's ineffective assistance of trial counsel claim is unexhausted or procedurally barred").[14]

## II. Ineffective Assistance of Trial Counsel

### A. Identification Testimony in General

Identification testimony is at once the "least reliable" form of evidence but "among the most influential" to a jury. *Kampshoff v. Smith*, 698 F.2d 581, 587 (2d Cir.1983). Courts have consistently viewed convictions built upon uncorroborated eyewitness identification with skep-

---

*See also Littlejohn*, 271 F.3d at 362 (generally, an amended petition "should not be construed as [a] second or successive petition").

**14.** Neither exhaustion nor procedural default are jurisdictional; hence, they can each be waived. For exhaustion *see Strickland*, 466 U.S. at 684, 104 S.Ct. 2052 (finding in the preAEDPA *habeas* context that "the exhaustion rule ... is not jurisdictional"); 28 U.S.C. § 2254(b)(3) (AEDPA provision stating that "a State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement"). For procedural default *see*

*Kuhali v. Reno*, 266 F.3d 93, 101 (2d Cir. 2001) (discussing procedural default in the *habeas* context and stating: "It is well-settled that the doctrine of procedural default is prudential rather than jurisdictional in nature.... Having failed to raise the issue of procedural default before the district court or us, the government has forfeited or waived the argument."). Respondent did, however, assert that the issue of effectiveness of appellate counsel was not exhausted, *see* Hrg. Tr. at 6; however, it became academic when Harris' counsel withdrew this claim during the *habeas* hearing. *Id.* at 59.

ticism. *See, e.g., id.* at 585–86 ("the experience of law and psychology has been that eyewitness testimony may sometimes be the least trustworthy means to identify the guilty.... Forensic science has ... thoroughly impeached the reliability of eyewitness identification."); *Jackson v. Fogg,* 589 F.2d 108, 112 (2d Cir.1978) (testimony of eyewitnesses "is the least reliable [form of evidence], especially where unsupported by corroborating evidence"); *Phan v. Greiner,* 165 F.Supp.2d 385, 398 (E.D.N.Y. 2001) (identification testimony "of a single eyewitness to whom petitioner [is] a stranger" is "notoriously unreliable, and is alone sufficient to undermine confidence in [a] verdict"). *See also* Jon O. Newman, The Madison Lecture: *Beyond "Reasonable Doubt,"* 68 N.Y.U. L.Rev. 979, 999 (1993) (arguing that uncorroborated eyewitness identification should be insufficient to sustain a conviction).

Furthermore, when the identification, as here, is cross-racial, it is "much less likely to be accurate than same race identifications." *Arizona v. Youngblood,* 488 U.S. 51, 72 n. 8, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (Blackmun, J., dissenting). *See also* Radha Natarajan, Note, *Racialized Memory and Reliability: Due Process Applied to Cross–Racial Eyewitness Identifications,* 78 N.Y.U. L.Rev. 1821 (2003) (surveying studies showing cross-racial identifications substantially more likely to be erroneous than same-race identifications due to the psychological phenomena of own-race bias, and arguing that due process requires an alternative test for the admissibility of cross-racial identifications).

**B. Harris' Counsel's Deficient Performance**

The failure of Harris' counsel to confront Punu at trial with her prior inconsistent statement given to the police within thirty minutes after she was accosted is simply inexcusable. A more compelling example of ineffective representation is difficult to fathom. Although, generally, the decision whether to cross-examine a witness, and "to what extent and in what manner," is "strategic in nature," *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.1987), courts can "second-guess such decisions" if there is "no strategic or tactical justification for the course taken[.]" *United States v. Luciano,* 158 F.3d 655, 660 (2d Cir.1998). Harris' counsel has offered what he believes were three strategic reasons for abjuring cross-examining Punu about her prior inconsistent description of her assailant: (1) she was a "very strong witness"; (2) "she never locked herself into the [complaint] report," and (3) he "didn't want to appear to be pushing her or badgering her in front of the jury." Hrg. Tr. at 28, 29, 43. Each is ludicrous.

That Punu was viewed by Harris' counsel as a compelling witness underscores the very reason why it was so essential to undermine her credibility. Second, Punu was never given the opportunity to repudiate the complaint report, nor was she even asked what she had told the police when they took her complaint, or what she might have told Officer Russo the next day; she simply testified that she had no recollection of whether the police had written anything down. This provided a perfect opportunity to confront her with the complaint report to jog her recollection or, if necessary, to call Officer Clifton to testify about what she told him. *See People v. Carter,* 227 A.D.2d 661, 641 N.Y.S.2d 908, 909 (3d Dep't 1996) (If a "witness denies that the statement was made or does not remember making it, he or she may be impeached by the testimony of others who heard the statement") (quoting Richardson on Evidence § 6–411 at 406 (Farrell 11th ed.)); *People v. Moore,* 193 A.D.2d 627, 597 N.Y.S.2d 444, 445 (2d Dep't 1993) (reversible error where court "precluded de-

fense counsel from questioning officer [who took complainant's statement] as to whether the complainant ever told him that her assailant weighed 250 pounds" when "[a]t trial, the complainant described her assailant as weighing 200 pounds, and she denied ever telling a police officer that he weighed 250 pounds"); *People v. Raffa*, 173 A.D.2d 748, 570 N.Y.S.2d 819 (2d Dep't 1991) ("court erred in precluding [defendant] from questioning Fire Marshal ... regarding a prior inconsistent statement made to him by [witness], which, at trial [witness] denied making").

■ In any event, Harris' counsel could have introduced the complaint report into evidence as a business record. *See People v. Jackson*, 40 A.D.2d 1006, 338 N.Y.S.2d 760 (2d. Dep't 1972) (allowing complaint report into evidence as a business record if "the complaining witness was the source of the information"); *see also People v. Selassie*, 140 Misc.2d 616, 532 N.Y.S.2d 326, 329 (Sup.Ct. Bronx Cty.1988) (admitting complaint report into evidence because "a hearsay statement contained within a business record shall be admissible to impeach a witness as a prior inconsistent statement"). Remarkably, Harris' counsel testified at the *habeas* hearing that it had never "cross[ed][his] mind" to speak to the officer who signed the report or call him to the stand. Hrg. Tr. at 37. *See Lindstadt*, 239 F.3d at 200 ("[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary") (quoting *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052).

■ Finally, Harris' counsel's reluctance to confront Punu about her prior inconsistent description for fear of "badgering" her is hardly an acceptable basis for allowing her identification of his client to go unchallenged. In *Eze*, the Second Circuit did not hesitate to find counsel ineffec-

tive for inadequate cross-examination, even when he was "faced [with] the unenviable task of cross-examining two young girls who, according to the prosecution, were victims of heinous and brutal sexual abuse." *Eze*, 321 F.3d at 133. The court noted that "while we understand the reluctance to appear aggressive toward the victims, one key inconsistency that would have severely undercut the children's credibility was inexplicably ignored by defense counsel." *Id.* While perhaps a sympathetic witness, Punu was not on a par with the young victims of sexual assault in *Eze*.

There are a number of case precedents in this circuit and in New York State courts railing against counsel's ineffectiveness for failing to challenge identification witnesses with prior inconsistent statements, be they sworn or unsworn, and whether or not made to law enforcement authorities, especially when, as here, the prosecution turned on the identifying witness' testimony. *See Lindstadt*, 239 F.3d at 204 (finding ineffective assistance of counsel where, *inter alia*, counsel failed to "effective[ly] challenge the credibility of the prosecution's only eyewitness"); *Harris v. Artuz*, 288 F.Supp.2d 247, 259–60 (E.D.N.Y.2003) (finding counsel ineffective where counsel failed to impeach the credibility of witnesses with evidence that would have aided defense's theory of misidentification); *People v. Winston*, 134 A.D.2d 546, 521 N.Y.S.2d 110, 111 (2d Dep't 1987) (counsel ineffective where he "made no attempt to impeach the victim" with previous inconsistent height description of assailant and the identification was a "key issue" in the case); *People v. Riley*, 101 A.D.2d 710, 475 N.Y.S.2d 691 (4th Dep't 1984) (finding ineffective assistance of counsel where counsel "did not endeavor to impeach the undercover officer with relation to discrepancies which appeared in the record" when the "resolution of factual

issues ... hinged upon the jury's assessment of the credibility of the undercover officer, the only witness who testified that defendant sold him drugs"). *See also Eze,* 321 F.3d at 126–27, 132–33 (finding counsel ineffective when he failed to introduce "various inconsistencies" in expert's previous findings and to cross-examine two victims with "inconsistencies [in their] stories" which were "critical to the defense"); *Sparman v. Edwards,* 26 F.Supp.2d 450, 454–55 (E.D.N.Y.1997) (finding counsel ineffective when he "failed to cross-examine [child sexual abuse victims] about ... inconsisten[t] ... statements that they made to the police").

Decisions from circuit courts outside the Second Circuit finding counsel deficient for failing to confront key witnesses with prior inconsistent statements, be they identification witnesses or otherwise, are equally compelling. *See, e.g., Moore v. Marr,* 254 F.3d 1235, 1241 (10th Cir.2001) (noting that "counsel's failure to impeach a key prosecution witness is potentially the kind of representation that falls outside the wide range of professionally competent assistance") (internal quotation and citation omitted); *Driscoll v. Delo,* 71 F.3d 701, 710 (8th Cir.1996) (failure to question witness with prior inconsistent statement made to investigators constituted deficient performance since there was "no objectively reasonable basis on which competent defense counsel could justify a decision not to impeach a state's eyewitness whose testimony ... took on such remarkable detail and clarity over time"); *Tomlin v. Myers,* 30 F.3d 1235, 1238 (9th Cir.1994) (defense counsel's performance deficient when counsel failed to challenge an in-court identification made by an eyewitness where the case "hinge[d] on an eyewitness's testimony"); *Harris v. Reed,* 894 F.2d 871, 878 (7th Cir.1990) (failure to call witnesses to contradict eyewitness identification of defendant was deficient performance); *Nixon v. Newsome,* 888 F.2d 112, 115–16 (11th Cir.1989) (failure to impeach with prior inconsistent testimony "sacrificed an opportunity to weaken the star witness' inculpatory testimony"); *Blackburn v. Foltz,* 828 F.2d 1177, 1183–84 (6th Cir.1987) (counsel deficient where he failed to impeach an eyewitness with previous inconsistent identification testimony when "weakening [the witness'] testimony was the only plausible hope [the defendant] had for acquittal").

Perhaps the case that best represents this Court's view of Harris' counsel's inexcusable performance is *Berryman.* There, the defendant's counsel failed to raise the victim's prior inconsistent testimony regarding her assailant's height and weight, where the defendant's conviction "rested solely on the victim's uncorroborated out-of-court identification, and her in-court identification." *Berryman,* 100 F.3d at 1097. In language equally applicable to the present case, the court concluded:

> It borders on the inconceivable that a trial attorney would fail to inform a jury of [the victim's] prior problems with this identification.... The reliability of this victim's uncorroborated identification [of the defendant] cuts directly to the heart of the only evidence against [the defendant]. [Counsel] failed to use it. That failure simply cannot be condoned as reasonable trial strategy.

*Id.* at 1099.

The Court views Harris' counsel's trial performance as questionable in other respects, such as (1) his failure to confront Officer Russo with the complaint report at the Wade hearing [15] and at trial to deter-

---

**15.** Harris' counsel's belief that the prior description was irrelevant to the objective of the

*Wade* hearing—where the focus was to determine whether the identification procedure

mine if it jogged Russo's recollection of the description of Punu's assailant when Russo first met with her; (2) his failure to cross-examine Punu about her inconsistent Grand Jury testimony, and (3) his failure to inform the jury that the complaint report stated that Punu had told the police that Harris did not display a gun. Regardless, because the failure to bring to the jury's attention Punu's prior identification of her assailant as eight inches shorter and 100 pounds lighter than the defendant was itself an error so blatantly egregious, even if one were to conclude that Harris' counsel otherwise performed competently, the performance prong of *Strickland* was clearly violated.

## C. Prejudice

■■■ Harris' entitlement to *habeas* relief hinges on whether the prejudice prong of *Strickland* has been satisfied: whether Harris' counsel's unprofessional errors were sufficient "to undermine confidence in the outcome of the trial." *Eze*, 321 F.3d at 137 (citation omitted). "[I]f it is determined following an evidentiary hearing that counsel's trial performance was constitutionally deficient, it is highly likely that *Strickland's* prejudice component would be satisfied." *Id.* However, "[e]ven serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt." *Lindstadt*, 239 F.3d at 205.

Respondent argues that, although Punu was the sole identifying witness, her testimony was sufficiently strong to render the jury's determination reliable because she had seen the defendant on two fairly recent occasions and was certain about her identification when she observed him while she was riding in the police car the night following the incident. Be that as it may, once again the court's language in *Berryman* rings true where, as here, the jury "never learned that [the key witness] had previously described the height of her assailants very differently from her [previous] testimony ... [and was] therefore never able to properly evaluate the strength of her identification." *Berryman*, 100 F.3d at 1102. As the court explained:

> We note that this is not merely a matter of a defense attorney deciding to forgo questioning an identification witness about minor discrepancies in her description, or the fact that her estimated height was off by a couple of inches.... The prejudice to Berryman is obvious.

> \* \* \*

> Berryman's guilt rested entirely on the accuracy of [the victim's] identification. Trial counsel had weapons that he could have used to attack that identification. He used none of them. It should have been obvious that [the victim's] inconsistent identification testimony from [previous] trials could raise serious questions in the minds of the jurors regarding [her] credibility and/or her ability to identify her assailants.

*Id. See also Griffin v. Warden, Maryland Correctional Adjustment Center*, 970 F.2d 1355, 1359 (4th Cir.1992) (commenting, in

---

was unduly suggestive—is simply incorrect. Determining whether an identification comports with due process requires an evaluation of the suggestibility and reliability of the identification. *See Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). One of the factors courts must consider in determining reliability is "the accuracy of [the witness'] prior description of the

criminal." *Id. See also Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir.2001) ("In determining whether a witness's in-court identification of the defendant has reliability independent of the unduly suggestive identification procedures, the court ... takes into account, [*inter alia*] ... the accuracy of the witness' prior description of the criminal.") (internal quotation and citation omitted).

finding prejudice: "[e]yewitness identification evidence, uncorroborated by a fingerprint, gun, confession, or co-conspirator testimony, is a thin thread to shackle a man for forty years"); *Nixon*, 888 F.2d at 116–17 (granting writ because counsel failed to introduce eyewitness' inconsistent identification where witness was the "only eyewitness to the murder to testify at trial" and "other evidence against [defendant] was far from overwhelming[.]"); *Blackburn*, 828 F.2d at 1184–86 (affirming grant of writ where counsel's failure to challenge "critical differences in [witness's] identification testimony" "left the only credible identifying witness's testimony virtually unchallenged"); *Harris*, 288 F.Supp.2d at 259 (finding prejudice where "[a]t the very least, [witnesses'] observational powers would have been called into serious question" if counsel had impeached witness with prior inconsistent statement, and by failing to introduce impeaching evidence, counsel "was unable to argue to the jury" that another individual was responsible for the crime).

Notably, the Second Circuit in *Lindstadt* found prejudice where counsel's errors "impaired his ability to mount an effective cross[-]examination" of the corroborating witnesses, *Lindstadt*, 239 F.3d at 204, and in *Eze* it concluded that its confidence in the outcome of the trial was undermined because of the defendant's counsel's "inability to provide a convincing explanation for … critically important omissions." *Eze*, 321 F.3d at 138.

The present case is as compelling as any of these exemplars of prejudice. One need reflect only for a moment about what would likely have occurred if Harris' counsel had confronted Punu with the description contained in the complaint report. If she denied giving that description, all counsel need to have done to totally undermine her credibility would have been to place the report in evidence or call Officer Clifton to testify, who would have presumably confirmed the accuracy of his report. If, on the other hand, she admitted giving the inconsistent description but attempted to walk away from it by explaining that it was dark or that she did not have a good view of the assailant, the certainty of her subsequent description, upon which respondent relies in arguing that the evidence was overwhelming, would likewise have been totally undermined.

Given that the case "rose or fell" on the strength of Punu's testimony, Hrg. Tr. at 11, that the jury was never told about the prior strikingly inconsistent identification by the sole eyewitness, the absence of any other evidence, the risks inherent in cross-racial identifications, and considering that "[m]istaken identification probably accounts for more miscarriages of justice than any other single factor—[and] perhaps … is responsible for more such errors than all other factors combined," *Wade*, 388 U.S. at 229, 87 S.Ct. 1926 (internal quotation omitted), the Court concludes that trial counsel's errors seriously undermined the reliability of the jury's verdict.

## CONCLUSION

Petitioner's writ of *habeas corpus* is granted. Harris shall be released from custody unless retried within sixty days.

**SO ORDERED.**